## Guarantee Company of North America v. Mutual Building and Loan Association, of Chicago.

1. EVIDENCE—*Of Funds Embezzled.*—When a person, who alone is charged with the duty, in his employment, of receiving and disbursing funds and of keeping the books of account, and the books show the receipt of funds of which there is no account of disbursement, and there is, in fact, a deficiency shown by the books to exist, the legal presumption is that the person whose duty it was to receive the funds did, in

fact, receive them, and no explanations being made, that he has dishonestly appropriated them to his own use.

2. SAME—*Books of Account.*—Books of account and other documents in writing furnish the best evidence of what they contain, but where the books are voluminous and intricate, resort to the aid of an expert book-keeper to explain the meaning of entries and the true state of the accounts to a jury or a court, may be had.

3. ACCOUNTS—*Statement Furnished Must be Objected to in Apt Time.*—When a statement of an account contained in voluminous books made by an expert accountant, showing a deficit occasioned by the dishonesty of a book-keeper, and furnished to a guarantee company, and by it kept without objection for four months, it was held that the statement was competent evidence in connection with the accountant's testimony to go to the jury in an action against the guarantee company on its bond.

4. PRINCIPAL AND SURETY—*Declarations of Principal as Evidence.*—The declarations of a principal are admissible in evidence against the surety on the trial of a suit upon the bond, when such declarations were made by the principal in the course of his duties, for the performance of which the surety bound himself.

5. INSTRUCTIONS—*What a Party Can Not Assign for Error.*—The presumption is that all instructions prepared by counsel and presented to the court, are requested to be given, and when so presented and requested to be given, the party offering them can not assign for error the fact that they are given.

**Memorandum.**—Suit upon a guarantee bond. In the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge, presiding; trial by jury; verdict and judgment for plaintiff; appeal by defendant. Heard in this court at the October term, 1894, and affirmed. Opinion filed January 10, 1895.

L. C. COOPER, solicitor for appellant.

M. L. RAFTREE, attorney for appellee.

MR. JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

This suit was brought by the appellee against the appellant, upon a guarantee bond given by the latter indemnifying the former against loss, not exceeding $3,000, which, during the term of the bond, the appellee might sustain through any dishonest or fraudulent act of one Charles A. Conolly in the performance of his duties as secretary of the

appellee; and from a judgment for $3,750 recovered against it, the appellant has appealed to this court.

The bond declared upon, and introduced in evidence, recited, *inter alia*, that

"Whereas the said employe (Connolly) has been appointed secretary at Chicago, Illinois, in the service of the said employer (appellee), and has been required to furnish security that he shall not be guilty of any dishonest or fraudulent act in the performance of his duties in the said capacity, by which the said employer shall suffer pecuniary loss." * * *

"Now, therefore, this bond witnesseth, that the said employe, for and on his own behalf, and the said company, fully relying on the truth of the statement and declaration contained in a certain document distinguished as "Employer's Guarantee Proposal" No. 79,066, dated the 6th day of October, 1886, and signed by the Mutual Building and Loan Association of Chicago, E. Francis, President, on behalf of the said employer, and lodged with the said company at its office in Montreal, and on the strict performance and observance hereafter, by the said employer, of the contract hereby created, do hereby respectively, severally, and jointly covenant with the said employer to reimburse unto said employer, or his or their representative or assigns, the amount of any loss, not exceeding in the whole the sum of $3,000, which, during the term of this bond, shall be sustained by the said employer, by reason of any act of fraud or dishonesty of said employe, in his employment, such reimbursement to be made within three calendar months next after proof shall have been given to the satisfaction of the directors of the said company, of the occurrence of such loss, and the proof thereof to include, if the directors shall so require, an affidavit to be made or taken by the person for the time being entitled to the benefit of this guarantee, to the effect that he hath been actually defrauded by the said employe, and that he suffered absolute and ultimate loss thereby, to the full amount claimed hereunder, and that the contract created as aforesaid, hath been

Guarantee Co. v. Mutual Building and Loan Ass'n.

performed and observed on the part of the said employer. Provided, always, that this bond and the guarantee hereby granted or undertaken, shall be subject and liable to the terms and conditions hereupon indorsed."

Indorsed upon the bond, are, among other things, the following :

" This bond is granted upon the following express conditions:

1.   Any intentional misstatement of a material fact, in the declaration within mentioned, or in any claim made under this bond, will render this bond void from the beginning.

3.   The party entitled to make a claim under this bond must immediately, upon discovering or receiving notice of any default by the said employe, notify the company at its head office; and this bond shall become absolutely void, both as to existing and future liabilities, if such claimant neglect or omit to so notify the company.

4.   This bond shall extend to cover only such losses as may have been incurred by reason of the fraud or dishonesty of the said employe within twelve months prior to the date of any notice of claim that may be made under it."

And the declaration concluded with an allegation that said bond was renewed from time to time, and that said Conolly, while acting as such secretary, and after the execution and delivery of said bond, dishonestly and fraudulently absconded and defaulted, and embezzled and stole from said plaintiff a large sum of money, to wit, $5,000, and that said sum became and was wholly lost to the plaintiff, and has never been recovered.

The bond was dated October 6, 1886, and had been regularly renewed by appropriate payments, and renewal receipts.

Conolly absconded on or about September 28, 1888. On that date he had prepared the draft of a statement in the nature of a report to the auditor of state showing the financial condition of the appellee from June 1, to September 30, 1888, whereon appeared an item of $1,255.49

on the disbursement side of the account, without any designation. The president of the appellee association, in examining the statement so prepared, asked Conolly for an explanation of that item, and a difference or controversy between them concerning it arose, and was being discussed, when Conolly excused himself on the ground of another engagement, and never returned. He wrote a letter on the same day to Mr. Francis, the president, and another letter, two days later, which are as follows:

"CHICAGO, Sept. 28, '88.

E. Francis, Esq., Prest.

DEAR SIR: It will no doubt shock you when I inform you that I can not balance the books, as there appears to be a shortage, a shortage which I know nothing of, and can not find. I have checked and checked, but with no success. If the auditors do not find it to-morrow there is only one thing of course left for you to do, and that is to put it before the Guarantee Company of North America. I am now on my way to Montreal, where I intend to report it to the head office. They will pay it and I will have to settle with them. The thing has almost driven me wild, as I think there has been systematic stealing for a long time, and although I know it to be a fact, I have no suspicions, and will tell you now that there has hardly been a time that the pass books have come in that I have not found quite a number of entries that were not in the ledger. This shortage I always paid, and it has taken nearly all my salary to do so, so you can understand that my life has not been a cheerful one. I will write you fully Sunday. Of course, this difference may turn up all right, but I doubt it, so this is the only course I can pursue. I don't feel that I am leaving the country to escape anything as I would come back if desired, but I can make better arrangements in Montreal, where I have influence.

Yours, truly,

CHAS. A. CONOLLY."

Guarantee Co. v. Mutual Building and Loan Ass'n.

"Toronto, September 30, '88.

E. Francis, Esq., Chicago:

Dear Sir : In my letter from Chicago to you I said I would write you again to-day. I don't know that there is very much for me to say, but that every time the pass books were called in there always appeared to be a shortage. This I have paid to the extent of $1,000, and on taking out a balance this month I found that it was about $2,000 short. I can not account for it in any possible way, and hope it may turn up in the books. I have been in such a state of excitement about it for a long time, so much so that my nerves are very much shattered, and I was not in a state to take out a balance, in fact, I was almost crazy. I intend going to see the Guarantee Co. to-morrow, and try and make satisfactory arrangements with them, for of course, I will have to see that they do not lose anything by me. I can not make an immediate settlement, but hope to arrange things in time. I certainly have been very unfortunate, for of course, this thing is a great blow to me in every way, for although I am in no way benefited, the thing will cling to me as if I were, and besides, it has affected my health by constant worrying to such an extent that I don't know where it will end, and I can't say that things look very bright for me.

Yours truly,

Chas. A. Conolly."

Immediately upon the receipt of the letter dated September 28th, Mr. Francis went to the office of appellant in Chicago, and there, in the absence of Mr. Grant, who was at that time secretary and general agent of appellant, in Chicago, met Mr. Collins, who was an inspector of appellant and whose duties were to get information and investigate concerning claims against appellant.

The letter was shown, and the situation, so far as understood, made known to Collins, who, in response to inquiries made by Mr. Francis as to what should be done, and whether the Guarantee Company would take charge of appellee's books, told Mr. Francis to find out what was stolen,

to get a good man and put him at work on the books, and as soon as the loss was ascertained the appellant would pay it. This conversation took place on Saturday, September 29th. On the next Monday, Mr. Francis again went to appellant's office in Chicago, and told Collins that he had employed Mr. Dayton, an expert accountant, to examine the books, and asked what else should be done on appellee's part.

Collins answered that he was personally acquainted with Mr. Dayton and that there was nothing else to be done except simply to find out what the loss or defalcation was.

Collins subsequently made inquiries, either by himself or in company with appellant's attorney, both of Mr. Francis and of the accountant, concerning the progress of the investigation and the method of procedure of the accountant, and the latter, at Collins' request, extended his examination back of a time originally fixed upon as a starting point; and on two occasions in the course of the examination, when told of the extent of deficit discovered up to those different dates, Collins offered to Mr. Francis to pay the disclosed shortages, in settlement. The examination by the accountant lasted about a month, and at its conclusion a statement showing the result was furnished to appellant, and remained in its possession, undisputed, for about four months, and there was at no time any dissatisfaction with the method pursued by appellee to determine the loss, expressed by appellant or its officers.

After the result of the accountant's examination was communicated to appellant, interviews were had between Mr. Francis, the president of the appellee, and Mr. Grant, the general agent of appellant, Mr. Collins and the attorney of the appellant, with reference to the loss and to an adjustment which would admit of Conolly returning to the United States without being prosecuted criminally, in order to admit of Conolly becoming better able to repair his default, but no objection was ever made to the correctness of the accountant's statement of deficiency.

The case made out by the appellee against the appellant depends largely upon that statement of the accountant and his testimony.

To make a thorough examination of the accounts of appellee, it was necessary for the accountant to examine the books of appellee kept by Conolly, including the pass books of some 400 members of the appellee association, and there is but little question that an accurate result was reached, and that the deficiency, as shown by the accountant's statement, actually existed.

It seems that no journal or day book was kept in the office of appellee, but only a cash book, check book, and ledger, and that the accounts had not been written up, or posted into the ledger for some four months previous to Conolly's departure.

Each member of the appellee association was, in the course of his business with the association, furnished with a pass book in which was entered all payments made by him to the association, and in order to determine, with accuracy, what amount of money had come into the hands of Conolly, it was necessary to call in all of the outstanding pass books and check them off with the cash book and ledger, and in the course of that work the accountant found a good many entries in the pass books that did not appear elsewhere.

Some of the entries in the pass books, of cash paid to the association, were made in the handwriting of a clerk who sometimes assisted Conolly—just how many does not appear.

The accountant testified that they were " very few; " that he could not say how many.

Now, the bond was given only to reimburse the appellee for losses resulting from the dishonest or fraudulent act of Conolly, and of no one else, and it may be said that before dishonesty or fraud can be imputed to Conolly, and a consequent liability be imposed upon appellant for a resulting loss, it is essential that it should be made to appear that the items constituting the deficiency, or some of them, came into Conolly's hands.

That there is evidence in the record of dishonesty on the part of Conolly, in his employment, can hardly be questioned; it is only the extent of his dishonesty, under the

evidence, that can be a matter of much hesitation, and it is, under the terms of the bond, only to that extent that the appellant is liable.

The statement compiled by the accountant showing the result of his examination, and to the accuracy of which he testified, shows a deficiency or shortage in the funds of the appellee during the period of Conolly's employment, amounting to $673.13 for the four months ending May 31, 1888, and for the four succeeding months, ending September 30, 1888, of $2,853.31, in addition.

Conolly, himself, in a letter of September 30th, speaks of an apparent shortage of about $2,000, and the statement prepared by him for the auditor of state and submitted to Mr. Francis showed an unexplained item of $1,255.49 on the disbursement side of the account, which Mr. Francis testified that Conolly said represented an overdraft on the bank of that amount. It was also proved that Conolly had charge of the office of appellee, that he kept books of the office, did the office work, was really active manager of appellee, and was the only person authorized to receive or pay out money.

The only evidence that any other person ever received any money for the appellee during the period of Conolly's employment, consists in the statement of the accountant that some of the entries in some of the pass books held by some members of the association were initialed in a different hand from that of Conolly.

With reference to how such entries came to be made by any person other than Conolly, the evidence is very scant. Mr. Francis, the president of appellee, testified that, " nobody had any right to receive money or initial any money receipts except Conolly;" that he was in the office three or four times a day during the whole period of Conolly's employment, and that at times, between 12 and 1 o'clock, when money was coming in pretty fast, he had seen Conolly receive the money and pass the books over to the office boy to initial.

It was also testified by Mr. Francis that nobody but Conolly had access to the vault where the money not in bank

was kept, except the auditors when making their examination.

Where one person alone is charged with the duty, in his employment, of receiving and disbursing funds and of keeping the books of account, and the books show the receipt of funds of which there is no account of disbursement, and there is in fact a deficiency shown by the books to exist, the legal presumption is that the person whose duty it was to receive the funds did in fact receive them, and no explanation being made, that he has dishonestly appropriated them to his own use. Such a presumption is of course rebuttable, but there was no attempt made to overcome the presumption, either by the testimony of Conolly, whose whereabouts in a small town in Canada, were known to appellant's officers, nor by the testimony of the office boy under Conolly, who, it does not appear, might not readily have been found, nor by any other means than by questioning the competency of portions of the evidence relied upon by appellee.

It is contended that because the books of the appellee, including the four hundred pass books held by its members, furnish the best evidence of what money came into Conolly's hands, they alone were competent to establish that fact, and that the testimony of the accountant as to what the books showed and his written statement of the result of his examination, were incompetent.

It is true of books of account as of all other documents in writing that they furnish the best evidence of what they contain, but it is also true that where books of account are voluminous and intricate, resort to the aid of an expert bookkeeper to explain the meaning of entries and the true state of accounts to a jury, or a court, may frequently be had. 1 Greenleaf on Evid., Sec. 93; Am. & Eng. Ency. of Law, Art. 71, p. 88; Underhill on Evid., Sec. 37 (1894); Hollingworth v. The State, 111 Ind. 289; Culver v. Marks, 122 Ind. 554; Burton v. Driggs, 20 Wall. 125.

It was proven here that no day book was kept, that the only books of the appellee from which the receipts and dis-

bursements by Conolly could be ascertained were the cash book, ledger and check book, and that the cash book had not been written up, nor the ledger posted, for four months last preceding Conolly's going away.

The check upon the cash book existed only in the pass books which belonged to and were held by the appellee's members—some four hundred ·in number. With the cash book not written up for 'four months, and the ledger not posted, there was for that period no complete evidence in the books of the appellee kept by Conolly of what had been received by him. Other evidence had to be resorted to, and that was to be found in pass books not in the possession of appellee. By calling them in and posting them into appellee's books the true condition of accounts could alone be determined. And that was what was done, and it was done by one who, under the circumstances of his employment, was as much the agent of appellant as of the appellee, and from all the circumstances, including four months' possession by appellant of his written statement, without objection showing the result of his work, we think it is fairly established that the accuracy of his result was acquiesced in by appellant.

That statement, the circumstances under which it was made, and at whose request it was made, and the fact that it was furnished to and held by appellant for a period of four months without question, was all made to appear, and we do not think that appellant can rightly contend that it was not competent evidence, in connection with the accountant's testimony, to go to the jury.

The testimony of the accountant and the statement showing in detail the result of his examination, disclosed that a shortage existed in the accounts of appellee at the time Conolly departed.

Whether that shortage was, as a matter of fact, occasioned by the fraud or dishonesty of Conolly did not depend alone upon the evidence furnished by the accountant who examined the books, but consisted in part of that, and in part of Conolly's admissions to Mr. Francis at the time his state-

ment for the state auditor was under consideration, and in part in his letters to Mr. Francis, and perhaps, in other circumstances.

From such evidence it was competent for the jury, and was exclusively within their province, to say whether Conolly had been guilty of fraud and dishonesty in his employment and to what extent. We should usurp the functions of the jury if we were to say that all or any part of the moneys that were lacking did not come to Conolly's hands, the evidence leaving that matter one of uncertainty.

The statement made by the accountant, and his testimony, showed a shortage in excess of the amount of the verdict.

We may not say that due allowance was not made by the jury for all the sums about which there was an uncertainty owing to the difference in the handwritings denoting the entries in the pass books.

The objections urged against the admissions of the testimony of Mr. Francis as to what was said between himself and Conolly when the statement for the auditor of state was being examined, are not well taken.

" Whether declarations of the principal are admissible in evidence against the surety depends upon whether the declarations were made in the course of his duties by the principal, for the performance of which the surety bound himself; " thus, evidence of a bank cashier's admissions, made in connection with a statement of the bank's condition presented by him to the board of directors, that the statement was false, and that he had embezzled certain sums and forced the accounts, were permitted in an action against the surety on the cashier's bond. Thompson on Liability of Officers and Agents, p. 542, note 5.

The record hardly sustains the abstract with reference to what is said in the latter concerning the $1,255.49 overdraft. It was Conolly, and not Francis, who said it was an overdraft.

The objection that "those three printed statements" as referred to in the record, and nowhere more specifically referred to in the abstract or brief, were refused to be admitted in evidence, will not be further noticed.

The fifth instruction given in behalf of appellee is objected to, but while it might have been amplified without harm, we do not see how, in view of the other instructions given, the jury could have been misled by it.

As to the sixth instruction for appellee, it includes an element—that of absconding—which should have been omitted as not being a matter to be taken into account by the jury. But it could have done no harm to appellant. Its effect was to require the jury to find, not only that Conolly was a defaulter, but also that he had " dishonestly and fraudulently absconded," a fact not at all in issue and, perhaps, not proved. In effect, therefore, it burdened rather than aided appellee's case, and is perhaps a good illustration of what courts frequently see, that juries look more to facts than to instructions as to the law, in arriving at the merits of a controversy.

As to both instructions, what was said in L. S. & M. S. Ry. Co. v. Johnson, 35 Ill. App. 432, with reference to instructions that are possibly subject to criticism in cases in which the court is entirely satisfied with the verdict, is applicable.

Another error urged by counsel for appellant is that the court gave to the jury two diametrically opposed instructions presented by him, where but one of them, whichever stated the correct rule of law, should have been given, and it is urged that if either instruction is correct, the other is necessarily wrong, and that therefore error was committed in giving both. The two instructions are precisely the same except in their concluding clauses; that of the seventh concluding with, " then the plaintiff can not recover in this action and the verdict should be for the defendant," and that of the eighth concluding with, " then the plaintiff is not entitled to recover a greater sum than the amount shown by the evidence to have been lost to the said plaintiffs by reason of the dishonest acts of Conolly at a specified time."

The bill of exceptions fails to show that the court was requested to give but one of the two instructions, and to give only that one which should harmonize with his view of the law.

The presumption is that all instructions prepared by counsel and presented to the court, are requested to be given; and when so presented and requested, the party offering them can not assign for error the fact that they are given. If, under such circumstances, error is committed, it is error of the party's own creating and can not be availed of by him.

Considering the whole record we feel that we can not say that substantial justice has not been arrived at.

The appellant undertook by its bond to indemnify the appellee against loss by the fraud or dishonesty of Conolly. That Conolly was guilty of either fraud or dishonesty we have no doubt from the evidence.

The extent of the loss resulting from that fraud or dishonesty is a question peculiarly for the jury to decide, and being found by them should not be disturbed.

· The judgment will therefore be affirmed.